**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE CLAIRE R. KELLY, JUDGE**

DREXEL CHEMICAL COMPANY, NUFARM AMERICAS INC., AND PBI-GORDON CORPORATION,

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

CORTEVA AGRISCIENCE, LLC,

Defendant-Intervenor.

Consol. Court No. 1:25-cv-00138

**Public Version**
Confidential information removed from pages: 3, 13-14, 17, 26-27, 33, 36, 38-43, 45-49, and 51-52.

**PLAINTIFFS' JOINT REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

/s/ Deanna Tanner Okun
Deanna Tanner Okun
Lydia C. Pardini
Alissa M. Chase
Joonho Hwang
Polsinelli PC
1401 I ("Eye") Street, NW Suite 800
Washington, DC 20005
Tel: 202-626-8329
Email: dtokun@polsinelli.com

*Counsel to Plaintiff Drexel Chemical Company*

/s/ Eric C. Emerson
Eric C. Emerson
Garrett Kays
Steptoe LLP

1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: 202-429-8076
Email: eemerson@steptoe.com

*Counsel to Plaintiff PBI-Gordon Corporation*

/s/ Daniel J. Porter
Daniel J. Porter
William C. Sjoberg
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: 202-663-8140
Email: daniel.porter@pillsburylaw.com

*Counsel to Plaintiff Nufarm Americas Inc.*

Dated: August 28, 2026

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION…………………………………………………………………………...1
ARGUMENT……………………………………………………………………………...1
I. THE COMMISSION'S DOMESTIC INDUSTRY DETERMINATION IS NOT IN ACCORDANCE WITH LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.... 1

A. The Commission's Domestic Industry Determination is Not in Accordance with Law .... 2

1. The Statutory Text Addresses a Quantitative, Rather Than a Qualitative Analysis....... 2

2. The Statute is Structured to Only Allow One Exclusion Under Limited Circumstances, Circumstances Not Present Here........ 3

3. The Legislative History Supports Broad Membership in the Domestic Industry........... 6

B. The Commission's and Corteva's Arguments to the Contrary Are Unavailing................. 7

1. The Commission's and Corteva's Support for the Production-Related Activities Test is Distinguished on the Facts........ 7

2. The Commission Misinterprets *Chemours*........ 11

3. The Commission's Domestic Industry Analysis Is Also Unsupported by Substantial Evidence........ 12

C. The Commission's Defense of Its Conclusion Regarding "Captive Production" Rests on Legal and Factual Error........ 14

1. The Commission's Conclusion that Corteva Sold "Significant" Volumes of the Domestic Like Product Remains Unsupported by Substantial Evidence........ 14

2. The Commission's Analysis of the "Domestic Like Product" Reflects a Misunderstanding of the Statute and the Facts of This Case........ 17

II. The Commission's Finding that Subject Import Volume Was Significant Was Neither Reasonably Explained Nor Supported by Substantial Evidence........ 20

A. The Statute Does Not Require the Commission to Consider Set Criteria When Assessing the Significance of Import Volumes, But the Commission Routinely Supplies Context for Significance and Must Provide a Reasoned Explanation for its Findings........ 20

B. The Commission's Cited Authorities Are Inapposite........ 23

C. On this Record, the Commission's Volume Finding Was Not Reasoned........ 25

D. Conclusion........ 28

III. The Commission's Finding of Significant Price Effects Was Neither Reasonably Explained Nor Supported by Substantial Evidence ........ 29

A. The Commission Failed to Sufficiently Consider Availability in Its Price Analysis ....... 29

1. Record Evidence Belies the Commission's Finding of Significant Underselling........ 33

B. The Commission's Finding that Subject Import Underselling Caused Lost Sales and Market Share was Not Supported by Substantial Evidence ........ 36

1. The Commission Failed to Address the Commission's Selective Reliance on Lost Sales Responses........ 36

2. The Commission Failed to Reconcile Corteva's *Post Hoc* Rationalization with Record Evidence........ 38

3. The Commission Fails to Defend Its Methodologically Flawed Variable-Cost Analysis ........40

4. The Commission Failed to Explain Why Corteva's Price-Out Theory Could Not Be Reconciled with the Actual Pricing Record........ 43

IV. The Court Should Not Affirm the Commission's Impact Analysis Because the Commission Failed to Reasonably Explain How the Domestic Industry was Harmed By Reason of Subject Imports........ 44

1. The Commission Acknowledged that Corteva's Withdrawal from the Merchant Market Would Break the Causal Link Between Subject Imports and Injury........ 45

2. The Commission's Valuation of Corteva's Internal Consumption in Interim 2024 Remains Unjustified and Contrary to the Findings of Its Own Staff........ 47

3. The Commission Failed to Account for the Impact of Corteva's Vertically Integrated Downstream Business on the Upstream Domestic 2,4-D Market ........ 49

4. Nonsubject Imports Played an Important Role in Market Dynamics During the POI . 51

V. CONCLUSION........ 53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2,4-D from China and India*,
Inv. Nos. 701-TA-710-711 and 731-TA-1673-1674, USITC Pub. 5618 (May 2025) ....4

*Acciai Speciali Terni, S.p.A. v. United States*,
19 CIT 1051 (1995) ....37

*Adisseo España S.A. v. United States*,
No. 21-562, 2023 WL 8866562 (Ct. Int'l Trade Dec. 2023) ....24, 25

*Altx, Inc. v. United States*,
167 F. Supp. 2d 1353, 1359 (Ct. Int'l Trade 2001) ....27, 37

*Altx, Inc. v. United States*,
No. 00-09-00477, 2002 WL 1560884 (Ct. Int'l Trade Jul. 2002) ....35

*American Alliance for Hardwood Plywood v. United States*,
392 F. Supp. 3d 1298, 1311 (Ct. Int'l Trade 2019) ....21

*Arlanxeo USA LLC v. United States*,
389 F. Supp. 3d 1330, 1338 (Ct. Int'l Trade 2019) ....21

*Changzhou Trina Solar Energy Co. v. United States*,
975 F.3d 1318 (Fed. Cir. 2020) ....3

*Chemours Co. FC, LLC v. United States*,
443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ....2, 11, 12, 31

*DAK Americas LLC v. United States*,
517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ....35

*DAK Ams. LLC v. United States*,
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ....12, 35, 36

*Eurodif S.A. v. United States*,
411 F.3d 1355 (Fed. Cir. 2005) ....8, 9, 10

*Fabricated Structural Steel from Canada, China, and Mexico*,
Inv. Nos. 731-TA-1432-1434, USITC Pub. 5031 (Mar. 2020) ....19

*Full Member Subgroup of the American Institute of Steel Construction, LLC v. United States*,
81 F.4th 1242 (Fed. Cir. 2023) ....3, 10, 19, 20

*Gifford-Hill Cement Co. v. United States*,
615 F. Supp. 577 (Ct. Int'l Trade 1985) ....................................................................37

*Government of Israel, Ministry of Economy & Industry v. United States*,
No. 24-197, 2026 WL 1972194 (Ct. Int'l Trade June 8, 2026) ..................................20, 23, 24

*Hot Rolled Steel Products from Argentina and South Africa*,
Inv. Nos. 701-TA-404 and 731-TA-898 & 905, USITC Pub. 3446, (Aug 2001)....................19

*Hydraulic Magnetic Circuit Breakers from South Africa*,
Inv. No. 731-TA-1033, USITC Pub. 3600 (June 2003)...........................................................22

*Hynix Semiconductor, Inc. v. United States*,
431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ....................................................................21, 44

*ITG Voma Corp. v. United States*,
253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017) ..........................................................................25

*Laminated Woven Sacks from China*,
Inv. Nos. 701-TA-450 & 731-TA-1122, USITC Pub. 4025 (July 2008)................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................................................23, 28, 44, 53

*Nippon Steel Corp. v. United States*,
182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) ..........................................................21, 23, 30

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)........................................................................... *passim*

*OCP S.A. v. United States*,
2025 WL 1837257 (Ct. Int'l Trade Apr. 2025) ..................................................................37, 45

*OCP S.A. v. United States*,
658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ..........................................................21, 23, 27

*OCTAL Inc. v. United States*,
539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ..........................................................21, 24, 25

*Pentafluoroethane (R-125) from China*,
Inv. Nos. 701-TA-662 & 731-TA-1554, USITC Pub. 5281 (Feb. 2022) ................................22

*Pokarna Engineered Stone Ltd. v. United States*,
56 F.4th 1345 (Fed. Cir. 2023) ..........................................................................8, 9, 10

*Royal Thai Gov't v. United States*,
502 F. Supp. 2d 1334 (Ct. Int'l Trade 2007).................................................................32

*Security & Exchange Comm'n v. Chenery Corp.*,
332 U.S. 194 (1947)......5

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994)......13

*Taiwan Semiconductors Industry Ass'n v. United States International Trade Commission*,
266 F.3d 1339 (Fed. Cir. 2001)......38, 40, 44, 52

*Tenaris Bay City v. United States*,
789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ......23, 24

*Truck and Bus Tires from China*,
Inv. Nos. 701-TA-556 & 731-TA-1311, USITC Pub. 4877 (Apr. 2019)......19, 22

*Truck Lines v. United States*,
371 U.S. 156 (1962)......5

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)......36, 43, 47, 53

*USX Corp. v. United States*,
655 F. Supp. 487 (Ct. Int'l Trade 1987) ......21

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ......13

**Statutes**

19 U.S.C. § 1677(4)(A)......1, 3, 8

19 U.S.C. § 1677(4)(B)......3, 4, 6

19 U.S.C. § 1677(7)(C)(i)......20, 23, 24, 28

19 U.S.C. § 1677(7)(C)(iii)......15, 16, 22

19 U.S.C. § 1677(7)(C)(iv)......14, 16

19 U.S.C. § 1677(7)(C)(iv)(I)......18

19 U.S.C. § 1677 (7)(C) and (D) ......15

Trade Agreements Act of 1979......15

Uruguay Round Agreements Act......7

## INTRODUCTION

An agency determination that is in accordance with law and supported by substantial evidence is one that accounts for the statutory text, statutory structure, legislative history and case law, as well as one that provides a reasonable consideration of the record as a whole, including evidence that detracts from the agency's conclusion. The Commission reiterates dozens of times in its brief that its conclusions were reasonable or that it acted reasonably—but recitation of foregone conclusions without meaningful consideration of contrary factual evidence exemplifies an unsupported argument or arbitrary decision. Where, as here, the Commission relies on unlawful statutory interpretations, unsupported factual findings, a fundamental misunderstanding of the scope of the domestic like product, and a failure to meaningfully consider record evidence that undermines its conclusions regarding domestic industry, price, volume, and impact, the Court should find the Commission's affirmative injury finding not in accordance with law, unsupported by substantial evidence, and remand.

## ARGUMENT

### I. THE COMMISSION'S DOMESTIC INDUSTRY DETERMINATION IS NOT IN ACCORDANCE WITH LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Under *Loper Bright v. Raimondo*, statutory interpretation is for the courts to decide through independent judgment, not deference to an agency's preferred construction. 603 U.S. 369 (2024). Applying the traditional tools of statutory construction—text, structure, and legislative history—to the term "industry" in 19 U.S.C. § 1677(4)(A), the Commission's use of a contrived "sufficient production-related activities" threshold cannot be sustained. The Commission's domestic industry determination is, therefore, not in accordance with law.

Even if the statute permits the Commission to ask whether a firm conducts sufficient production-related activities in the United States, the Commission applied that inquiry in an inconsistent manner. *See Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020). *Chemours* makes clear that the ultimate question is whether the processors' activities are sufficient in their own right—not in comparison to those activities of a vertically integrated producer. Here, the Commission treated the Converters' smaller scale relative to Corteva Agriscience, LLC ("Corteva") as dispositive without identifying any independent threshold of sufficiency or explaining why the Converters' substantial domestic manufacturing activities failed that threshold.

The Commission's analysis is also unsupported by substantial evidence. Plaintiffs do not ask the Court to reweigh the record. They ask the Court to require a reasoned explanation that is consistent with the substantial evidence standard, connects the statutory inquiry to the evidence, and addresses important facts that detract from the Commission's conclusion. The Commission's determination does not supply that explanation.

## A. The Commission's Domestic Industry Determination is Not in Accordance with Law

Notwithstanding the Commission's and Corteva's arguments, the Commission's use of the "sufficient production-related activities" test to determine membership in the domestic industry is not in accordance with law. The statutory argument and, independently, the Commission's application of the test, each require remand.

### 1. The Statutory Text Addresses a Quantitative, Rather Than a Qualitative Analysis

*Loper Bright* requires courts to exercise independent judgment in interpreting statutes. "Courts interpret statutes, no matter the context, based on traditional rules of statutory construction, not individual policy preferences." *Loper Bright*, 603 U.S. at 369, 374. Applying

the statutory text, structure, and legislative history—the traditional rules recognized by the Federal Circuit—shows that the Converters are producers within the domestic "industry." *See Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020).

To quote the statute:

> {t}he term "industry" means the producers as a whole of a domestic like product, or those producers whose ***collective output*** of a domestic like product ***constitutes a major proportion*** of the total domestic like product.

19 U.S.C. § 1677(4)(A) (emphasis added). The plain text of the statute contemplates a quantitative, not a qualitative, analysis. The statute first identifies the relevant class—"producers" of the domestic like product—and then permits the Commission to examine whether a subset accounts for a "major proportion" of output. Nothing in the text authorizes the Commission to exclude a company that actually manufactures the domestic like product because its operations are less extensive than those of an integrated producer. The Converters chemically transform 2,4-D acid into in-scope esters and salts; they, therefore, "actually make{} the product in the domestic industry at issue." *Full Member Subgroup of the American Institute of Steel Construction, LLC v. United States*, 81 F.4th 1242, 1255 (Fed. Cir. 2023)). Moreover, because the Converters manufactured over **[ ]** of the total domestic like product in any one segment of the period of investigation ("POI"), the Commission's additional qualitative threshold has no textual anchor. *See Final Staff Rpt.* at Table C.3 (C.R. 179).

2. The Statute is Structured to Only Allow One Exclusion Under Limited Circumstances, Circumstances Not Present Here

The statutory structure reinforces the text. Congress separately authorized the Commission, in appropriate circumstances, to exclude related producers and importers under 19 U.S.C. § 1677(4)(B). That express exclusion mechanism weighs strongly against implying an

additional, uncodified power to exclude firms that indisputably manufacture the domestic like product.

Section 1677(4)(B) permits the Commission, in appropriate circumstances, to exclude a producer that is related to an exporter or importer or that is itself an importer of subject merchandise. The Commission did not base its domestic industry definition on an actual exercise of that discretion.

In the underlying administrative proceeding, the Commission expressly declined to reach the question of "whether appropriate circumstances exist to exclude {Converters} under the related parties provision," because it had already found that Converters lacked sufficient production-related activities to qualify as domestic producers in the first place. *2,4-D from China and India*, 90 Fed. Reg. 21,946 (May 22, 2025) (P.R.168)[1]; *2,4-D from China and India*, Inv. Nos. 701-TA-710-711 and 731-TA-1673-1674, USITC Pub. 5618 (May 2025) ("*Views*")[2] (P.R. 164, C.R. 200) at 28 n.100. In the very same footnote, however, the Commission appended an unadopted, hypothetical aside stating that, "were" it to have found Converters engaged in sufficient production-related activities, it "would" have excluded them as related parties. *Id*. The Commission and Corteva now seize on that hypothetical aside, accompanied by facts not otherwise used to support the Commission's affirmative determination, as an independent, alternative basis for affirmance. Def. Br. at 28-29; Def.-Int. Br. at 19.

The Commission's and Corteva's reliance on this unadopted dicta is misplaced. An agency's discretionary order must be sustained, if at all, on the basis the agency actually articulated

[1] Citations to the administrative record indicate the public and confidential record document numbers ("P.R." and "C.R.," respectively).

[2] For ease of reference, hereinafter, Plaintiffs refer to the *Views of the Commission*, as set forth in the confidential record, as "*Views* (C.R. 200)."

as its determination, not on a hypothetical the agency expressly declined to adopt. Burlington *Truck Lines v. United States*, 371 U.S. 156, 168-169 (1962) (quoting *Security & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). By its own terms, the Commission "does not reach the question" of whether appropriate circumstances exist to exclude Converters under the related parties provision. *Views* at 28 n.100 (C.R. 200). A footnote observation that the Commission expressly refused to decide is not a "determination" this Court can affirm; it is, at most, a litigating position that Defendant's counsel now advances for the first time on judicial review to salvage a determination that Plaintiffs have shown is otherwise unlawful and unsupported. That is precisely the kind of post hoc rationalization *Chenery* forbids.

Even if this Court were to entertain the Commission's unadopted aside, it cannot supply an adequate alternative basis for affirmance. In deciding whether appropriate circumstances exist to exclude a related party, the Commission examines multiple factors, including the percentage of domestic production attributable to the importing producer, the reason the producer imports the subject merchandise, whether inclusion or exclusion would skew the industry data, the ratio of import shipments to domestic production, and whether the producer's primary interest lies in domestic production or importation. *Views* at 28 n.96 (C.R. 200) (citing *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp. 3d 1314, 1326-31 (Ct. Int'l Trade 2015)). Rather than apply those factors to the Converters, the Commission's footnote offers only the single, conclusory assertion that Converters' "domestic production operations benefited substantially from their subject imports such that their inclusion in the domestic industry would skew the domestic industry data and mask injury." *Id.* at 28 n.100. A hypothetical finding the Commission never tested against its own multi-factor framework, and expressly declined to adopt, cannot substitute for the reasoned explanation that substantial evidence review demands.

### 3. The Legislative History Supports Broad Membership in the Domestic Industry

In determining whether an industry in the United States is materially injured, threatened with material injury, or the establishment an industry is being materially retarded, the legislative history describes "industry" as:

> (1) {a}ll of the domestic producers who produce products like the imported articles subject to the investigation, or, if no such product exists, the product most nearly similar in characteristic and use to the imported article subject to the investigation; (2) domestic producers, wherever located in the United States, who comprise less than the entire group of producers of like products, if the total output of this smaller group of producers constitutes a major proportion of the total domestic production of that product; or (3) a regional industry. What constitutes a major proportion of total domestic production will vary from case to case depending on the facts and no standard minimum proportion is required in each case.

S. Rep. No. 96-249, at 83 (1979). Congress is clearly focused on production of the domestic like product as a metric for membership in the domestic industry. Noticeably absent from the foregoing definition are any qualitative factors.

Likewise, noticeably absent from the legislative history is any suggestion that Congress intended the Commission to police which stages of production "count," the weights to be assigned to the stages, and/or to disqualify downstream producers of the domestic like product based on qualitative factors. *See* Pl. Br. at 21. Both the Commission's and Corteva's briefs fail to address this meaningful omission. Section 1677(4)(B) permits the Commission, in appropriate circumstances, to exclude a producer that is related to an exporter or importer or that is itself an importer of subject merchandise. The Commission did not base its domestic industry definition on an actual exercise of that discretion.

The Uruguay Round Agreements Act did "not change the basic definition of domestic industry in {19 U.S.C. § 1677}(4)(A)"; however, it did re-enforce the disparate roles of the Department and the Commission with regard to the term "industry."

> In this regard, Commerce and the Commission utilize section 771(4)(B) for different purposes. Commerce to eliminate any conflicts of interest that may distort its consideration of the level of industry support of an antidumping or countervailing duty petition, and the Commission to reduce any distortion in industry data caused by the inclusion in the domestic industry a related producer who is being shielded from the effects of subject imports. For this reason, each agency will have discretion to apply this provision to accomplish these different purposes, even where this may lead to different results in individual cases.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. 103-316, vol. 1, at 857-858 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").

In sum, the application of the traditional rules of statutory construction all point to the same result: unless an exception applies, all producers of the domestic like product are members of the domestic industry for purposes of the Commission's injury analysis if they meet the quantitative requirement that their collective output constitutes a major portion of the domestic like product. The only exceptions that arguably could apply were either not used to support the Commission's determination—*i.e.*, the related parties provision—or, as set forth below, were limited to facts not before this Court.

**B. The Commission's and Corteva's Arguments to the Contrary Are Unavailing**

The Commission and Corteva attempt to support their arguments by citing case law, which the courts unquestionably limited to the facts—facts not present here—or otherwise misinterpret cases to fit their desired narrative.

1. The Commission's and Corteva's Support for the Production-Related Activities Test is Distinguished on the Facts

The Commission and Corteva argue that courts have endorsed the Commission's use of the sufficient production-related activities test for purposes of the Commission's injury analysis. The case law cited is inapposite on the facts. *See* Def. Br. at 23-26 and Def.-Int. Br. at 12-14 (citing *Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345 (Fed. Cir. 2023); *Eurodif S.A. v. United States*, 411 F.3d 1355 (Fed. Cir. 2005); and Def. Br. at 25, 37 (citing *Full Member Subgroup*, 81 F.4th at 1242).

The Commission and Corteva cobble together a few opinions in a failed attempt to support the definition of "producers" in the Commission's injury analysis. As set forth below, both the Commission and Corteva are wrong. Indeed, the Federal Circuit has yet to opine on this specific issue. In each opinion cited by the Commission and Corteva, the Federal Circuit limits its holdings to the facts, two of which involve a different agency, the U.S. Department of Commerce ("Department"), and all three of which involve different agency tasks than the one before this Court. As such, Plaintiffs submit that this Court should analyze the issue of the composition of the domestic "industry" anew per *Loper Bright* by considering the statutory text, the statutory structure, and the legislative history. *See* Pl. Br. at 17-21. After such consideration, the answer is clear: the Converters should be included in the domestic industry for purposes of the Commission's injury analysis.

In *Pokarna*, the Federal Circuit analyzed the Department's industry support calculation for purposes of determining whether the antidumping duty petition was filed by the requisite portion of the domestic industry and, in turn, the Department's definition of "producers" in that context. The Federal Circuit held the following:

> {W}e affirm Commerce's interpretation of the term "producers" as an entity that requires a stake in the domestic industry. We further affirm Commerce' use of the sufficient production-related activities test to determine that the fabricators did not have a sufficient stake

> in the domestic industry and thus did not qualify as "producers" ***for purposes of calculating industry support***.

*Pokarna*, 56 F.4th at 1351 (emphasis added). Clearly, the Federal Circuit limited its decision to Commerce's definition of "producers" and Commerce's use that term in the context of calculating industry support. Those limits are plainly apparent when the Federal Circuit later summarized its holdings, *viz*:

> We further note that there is no requirement that Commerce and the ITC reach the same conclusion on the same issue. . . . Commerce and the ITC perform different functions and have different goals. Here, Commerce has interpreted the term "producer" with the goal of determining which parties have a stake in the domestic industry and how to calculate industry support. The ITC has, in contrast, interpreted the term "producer" to determine whether the domestic industry has suffered a material injury as a result of imports. Thus the ITC's determination of the meaning of "producers" remains separate and apart from Commerce's . . . .

*Id.* at 1352.

*Pokarna's* limitations are also apparent in the Federal Circuit's response to a plaintiff's argument that the Court conduct a *Chevron* analysis because the term "producers" is not defined in the statute. *Id.* at 1350. In response, the Federal Circuit stated that it need not conduct such an analysis because its precedent already interpreted the term "producers." *Id.* (citing *Eurodif*, 411 F.3d at 1360-61). Like *Pokarna*, the issue in *Eurodif* was whether domestic utilities or foreign enrichers of uranium were "producers" of low enriched uranium ***for purposes of determining whether there was sufficient industry support*** to begin an antidumping and countervailing duty investigation. Unsurprisingly, the *Pokarna* Court found *Eurodif* controlling as the issue was before the same agency, involved the same statutory provision, and task, *i.e.*, calculating industry support for a petition.

Importantly, the *Eurodif* Court also specifically limited its opinion to the facts even within the same agency. In response to an argument that the Department treat tolling operations the same for purposes of determining both export price and industry support, the Federal Circuit stated,

> {f}urther, determining export price of a good and determining whether a petition has enough support for an investigation to be initiated are two different tasks that were delegated to Commerce for different purposes. Thus, using the tolling regulation in one context but not using it in another is a clearly insufficient basis upon which to conclude that Commerce's action was not in accordance with law.

*Eurodif S.A.*, 411 F.3d at 1361. Stated differently, the Federal Circuit, again, confirms that, even within an agency, the definition and/or application of the same term or terms can be different depending on the context. Notwithstanding *Pokarna's* and *Eurodif's* guardrails, the Commission invites this Court to broadly apply the Federal Circuit's holding in *Pokarna* to a different agency and to a different task. This Court should decline the Commission's invitation.

The Commission also cites *Full Member Subgroup* to no avail. At issue in *Full Member Subgroup* was whether to apply the captive production provision when producers of the like product did not also produce the downstream article. *Full Member Subgroup*, 81 F.4th at 1255 (citing 19 U.S.C. § 1677(7)(C)(iv)). In other words, the producers of the domestic like product did not internally transfer the like product to produce a downstream product, as required by statute, but instead sold it to unaffiliated producers for that purpose. Citing *Pokarna*, the Federal Circuit stated that "{a} 'producer' must have sufficient product-related activities such that it has a 'stake,' *e.g.*, it actually makes the product in the domestic industry at issue." *Id.* at 1255. Unlike the downstream producers in *Full Member Subgroup*, the Converters at issue in the instant appeal "actually make the product in the domestic industry at issue." The foregoing is hardly an explicit or even implicit Federal Circuit endorsement of the application of the sufficient production-related

activities test in determining the composition of the domestic industry for purposes of a Commission injury analysis.

The structure of the relevant statute provides one exception to the general rule that all producers of the domestic like product are members of the domestic industry. While Plaintiffs recognize courts have endorsed the application of the sufficient production-related activities test under specific circumstances and facts, those circumstances and facts are not present here.

2. The Commission Misinterprets *Chemours*

Even assuming *arguendo* that the Commission may apply a sufficient production-related activities test in certain circumstances, the Commission overreads *Chemours*. The issue is not whether comparative evidence may ever be considered; it is whether a comparative scale may substitute for deciding whether the Converters' activities are independently sufficient.

*Chemours* affirmed the Commission's position that "the relevant question" was whether processors' activities were sufficient to qualify them as producers, "not" whether those activities were at the same or a higher level than integrated producers. *See* 443 F. Supp. 3d at 1324. The Government now emphasizes that *Chemours* also discussed comparative data. Def. Br. at 26. That is true, but it does not answer Plaintiffs' point: comparative data may inform the analysis, yet the legal conclusion must still rest on an independent assessment of sufficiency.

Here, the Commission never identified what level of domestic activity would be sufficient on its own. Instead, it found the Converters' activities inadequate because Corteva's greenfield replacement cost and value added were higher, Corteva performed the additional upstream step of producing acid, and the Converters used imported acid. *Views* at 24-26 (C.R. 200). That reasoning makes vertical integration the benchmark and effectively ensures that downstream producers lose whenever compared with an integrated producer. *Chemours* rejected that comparative hierarchy as the legal test. The Commission either had to assess the Converters' operations independently

or explain a reasoned departure from that approach. It did neither. *See DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1355-56 (Ct. Int'l Trade 2020).

The Commission's new characterization of *Chemours* fares no better. It now asserts that the Commission's determination "explicitly compared the production-related activities of processors with those of integrated producers for each factor," Def. Br. at 26-27, in an effort to recast *Chemours* as endorsing the comparative approach the Commission employed here. But that is not the position the Commission itself took when litigating *Chemours*. In its own response brief in that case, the Commission told this Court that "{t}he relevant question for the Commission was whether processors' production-related activities were sufficient to qualify them as domestic producers, not at the same or higher level than producers." *See* Pl. Br. at 23 (quoting Response Br. of the U.S. International Trade Commission at 2, *Chemours Co. FC, LLC v. United States*, No. 18-174 (Ct. Int'l Trade July 17, 2019), ECF No. 83). The Commission cannot now disavow the very characterization of *Chemours* that it advanced—and that this Court accepted—simply to justify a different, comparative approach here. Whatever comparisons the Commission drew in *Chemours*, the ultimate inquiry it told this Court to apply was whether the processors' activities were sufficient on their own, not whether they matched those of the integrated producer.

3. The Commission's Domestic Industry Analysis Is Also Unsupported by Substantial Evidence

At the outset, we note that the Commission's brief departs from the Commission's views. The *Views* attempted to distinguish *Chemours* principally because the processors in that case used an "appreciable portion" of U.S.-sourced material. *Views* at 25 n.90 (C.R. 200). The Commission's brief instead argues that the agency's analysis was fully consistent with *Chemours*. Def. Br. at 26-28. The Court should evaluate the rationale the Commission actually provided in its determination, not a reformulated litigation defense.

Even if the comparative framework were lawful, the Commission's application of it lacks a reasoned explanation. The final-phase record resolved the preliminary concern that the Converters' figures included out-of-scope formulation activities, yet the Commission continued to discount evidence favorable to the Converters without explaining why the corrected data were insufficient. *Views* at 22 and n.83 (C.R. 200).

The Commission emphasized that Corteva's estimated greenfield replacement cost was more than **[ ]** times the Converters' combined estimate. *Views* at 24, 26 (C.R. 200). But greenfield replacement cost is a hypothetical measure that inherently captures Corteva's vertically integrated acid-production facilities; it does not establish that the Converters' existing ester- and salt-manufacturing operations are insubstantial.

The Commission did not reconcile that metric with the Converters' combined asset values—**[ ]** times Corteva's at the low end and **[ ]** times at the high end—or with Nufarm's substantially greater employment, the Converters' comparable technical-complexity ratings, and their greater aggregate POI capital expenditures. Pl. Br. at 25-26; *Views* at 18-20, 25 (C.R. 200). Nor did it explain why Corteva's unquantified pre-POI R&D and capital expenditures were relevant while the Converters were not asked for comparable pre-POI information. Finally, the value-added percentage largely reflects the cost of the purchased acid input and, therefore, says little about whether the domestic chemical conversion itself is genuine manufacturing.

The Commission's selective reliance on the metrics favoring Corteva, without addressing these countervailing facts, is not a reasoned evaluation of the record as a whole. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).

The Court may uphold a determination of less than ideal clarity only when the agency's path can reasonably be discerned. *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1350 (Ct.

Int'l Trade 2024). Here, the path is not discernible because the Commission never articulated an independent sufficiency threshold, discounted corrected evidence without explanation, and treated measures of vertical integration as dispositive. Remand is required.

### C. The Commission's Defense of Its Conclusion Regarding "Captive Production" Rests on Legal and Factual Error

Regardless of how the domestic industry is defined, this Commission's conclusion regarding the "captive production" production of the statute cannot be sustained. In their opening brief, Plaintiffs explained why the Commission's decision to rely on the "captive production" provision, 19 U.S.C. § 1677(7)(C)(iv), was contrary to the plain language of the statute and was unsupported by the evidentiary record. In response, the Commission attempted to defend its decision on two grounds: first, that its decision that Corteva sold a "significant" volume of the subject merchandise in the merchant market was supported by the record, and second, that Corteva did not in fact sell the "domestic like product" back into the U.S. market.[3] Neither of these arguments is sufficient to save the failings in its *Views*.

#### 1. The Commission's Conclusion that Corteva Sold "Significant" Volumes of the Domestic Like Product Remains Unsupported by Substantial Evidence

In its *Views*, the Commission concluded that "significant production of the domestic like product is . . . sold in the merchant market." *Views* at 41 (C.R. 200). In their opening brief, Plaintiffs explained that this conclusion was factually incorrect, as Corteva sold only a minor volume of the domestic like product into the merchant market during the POI, declining to just **[ ]** in the interim period. Pls. Br. at 29. Plaintiffs' fundamental point is that the values reflected in the factual record were not obviously "significant"—indeed, far from it—and that the Commission provided no explanation of the standard by which it concluded that these volumes

[3] Defendant-Intervenor Corteva declined to address these arguments in its brief.

were "significant." In its brief, the Commission offers several arguments why its determination of "significant" was correct, but none withstand scrutiny.

To restate Plaintiffs' position, it is far from self-evident that the volume of production sold in the merchant market at any point during the POI, but particularly in the interim 2024 period, was "significant." While Plaintiffs agree that the statute does not define what constitutes "significant" in this context, the Commission nevertheless has an affirmative obligation to explain why the shipment volumes observed in this case meet this standard—an obligation that is particularly difficult to meet in this case, given the minuscule shipment volume in the merchant market observed in interim 2024.[4]

The Commission first attempts to defend its position that the determination of what constitutes "significant" can be determined by analyzing data from earlier periods in the POI. While the statute does not explicitly provide the Commission with this authority, the Commission takes the position that after the statutory requirements for the "captive production" provision are met (including the determination of "significant"), the Commission is to apply the language of 19 U.S.C. § 1677(7)(C)(iii), which speaks of "actual and potential decline{s} in output, sales, and market share." *Views* at 42 n.156 (C.R. 200) and Def. Br. at 31-32. The Commission states that this reference "necessarily entail{s} a consideration of data over the entire POI," Def. Br. at 31, which the Commission believes empowers it to consider shipment volumes from earlier in the POI to make a determination of "significant."

[4] The Commission cites the legislative history of the Trade Agreements Act of 1979 for the proposition that "the significance to be assigned to a particular factor is for the ITC to decide." Def. Br. at 32 (citing S. Rep. No. 96-249 at 88, 96th Congress, 1st Sess. (1979)). While the Commission's quote is accurate, it has been taken entirely out of context. The Senate Finance Committee's statement is intended to convey that the "significance" – *i.e.*, the weight – to be afforded to any given factor under 19 U.S.C. § 1677 (7)(C) and (D) is left to the Commission's discretion. But that statement has nothing to do with the definition of "significant" – *i.e.*, the size or volume – of sales necessary to satisfy the "captive production" provision of the Act.

But this analysis puts the cart before the horse. While the Commission rightly notes that the Commission is to analyze the merchant market according to these factors for purposes of determining causation, that analysis is to be conducted after the Commission concludes that the terms of 19 U.S.C. § 1677(7)(C)(iv) apply. There is nothing in the statute to suggest that a provision intended to instruct the Commission as to causation is intended to inform the decision whether a domestic producer's shipment volume is "significant." In other words, there is nothing about the final sentence of 19 U.S.C. § 1677(7)(C)(iii) that empowers the Commission to overlook a patently trivial shipment volume in the more recent and more relevant interim period to support the position that such volume is "significant."

The Commission's second justification is that "the Commission found the quantum of merchant market sales reported by Corteva significant based on Petitioner's claim that it was priced out of the merchant market at the end of the POI by low-priced subject imports." Def. Br. at 33. Under its normal approach to determining material injury, the Commission first determines which companies and what shipments constitute the domestic industry, after which it determines whether the domestic industry has been injured by reason of subject imports. Here again the Commission has inverted its causation analysis and used Petitioner's allegation of causation as a tool to help define the domestic industry—specifically, to define what constitutes "significant." There is nothing in the statute or in the SAA that suggests that the Commission can bootstrap its causation analysis into its definition of the domestic industry more generally or specifically as to the "captive production" provision.

Furthermore, the Commission's rationale is internally inconsistent. By referencing Petitioner's claim of subject import competition, it appears that the Commission is suggesting that the quantum of Corteva's shipments into the merchant market is lower than it would have been

absent allegedly unfairly priced subject imports. While Plaintiffs dispute that allegation, it is difficult to square this statement with the Commission's position that the quantity of shipments to the merchant market is "significant." In fact, it suggests the exact opposite. Indeed, the Commission appears to concede as much itself, by suggesting that the invocation of the "captive production" provision is necessary to "assess Corteva's argument that low-priced subject imports are what caused the share of its U.S. shipments made to the merchant market to decline from significant levels during the 2021-2023 period to **[ ]** percent in interim 2024." Def. Br. at 33. The omission of the word "significant" with respect to interim 2024 in the foregoing sentence strongly implies that not even the Commission believes that the shipments in the interim 2024 period satisfy the "significant" requirement of the "captive production" provision. And there is no basis in the statute to argue that the determination of "significant" should be made but for the presence of subject imports in the marketplace, nor is there any basis in the statute that the Commission can find shipments to the merchant market to be "significant" based solely on specific periods in the POI – particularly historical periods.

The foregoing discussion demonstrates that there is no reasonable evidentiary basis for the Commission to conclude that Corteva's shipments of the domestic like product to the merchant market are "significant," and that the Commission's conclusion on this point is not supported by substantial evidence and is not in accordance with law.

2. The Commission's Analysis of the "Domestic Like Product" Reflects a Misunderstanding of the Statute and the Facts of This Case

Plaintiffs' second argument is based on a plain reading of the language of the statute in connection with the scope of the investigation as drafted by Corteva. As Plaintiffs explained before the agency and in their opening brief, the 2,4-D component of the fabricated products produced and sold by Corteva constitutes the domestic like product, meaning that the internally transferred

domestic like product does in fact enter the merchant market. 19 U.S.C. § 1677(7)(C)(iv)(I). In its brief, the Commission effectively repeats the same analysis from its *Views* to conclude that the 2,4-D contained within formulated herbicide product does not constitute the entry of the domestic like product into the merchandise market as the herbicides that Corteva sells are out-of-scope downstream products.

On this point, the basic facts are not at issue. What is at issue is the Commission's conclusion that the 2,4-D component of formulated herbicide products, when sold into the merchant market, does not constitute the sale of the domestic like product. In concluding that it does not, the Commission fails to acknowledge that, as a direct result of the language of the scope advanced by Corteva, the 2,4-D component of those formulated herbicide products **is** the domestic like product. If Corteva had not added the provision that the 2,4-D component of formulated herbicide remained subject to the scope, the Commission's conclusion would be entirely correct: Corteva's sales of downstream herbicide products made with/from 2,4-D would not constitute the entry of the domestic like product into the market.

But Corteva's decision to include the 2,4-D component of formulated herbicide products within the scope, and thus within the domestic like product, renders this conclusion false. If a foreign producer sold a formulated herbicide product containing 2,4-D into the U.S. market, the 2,4-D component of that otherwise non-scope herbicide would be subject to AD/CVD liability. It is therefore unclear why the Commission would not equally conclude that when Corteva sells its formulated herbicide products into the U.S. market, the 2,4-D component of those otherwise downstream products constitutes the entry of the domestic like product into the merchant market. The two scenarios are entirely parallel, and the conclusion regarding the former necessarily compels the conclusion with respect to the latter.

It is for this reason that the cases upon which the Commission relies in its brief are entirely distinguishable. In those cases, the subject merchandise does not remain part of the scope of the case after it has been incorporated into a downstream product. For example, in the *Hot Rolled* case, the scope of that investigation did not specify that the hot rolled steel component remains subject merchandise even after it has been processed into cold rolled steel.[5] Def. Br. at 35. Thus, when cold rolled steel made from hot rolled steel was sold into the merchant market, no part of it constituted the domestic like product.

The Commission's citation to *Full Member Subgroup*,[6] Def. Br. at 37, is curious since in relevant portion, it fully supports of Plaintiffs' position. *Full Member Subgroup* involved an appeal from the Commission's determination in *Fabricated Structural Steel from Canada, China, and Mexico*, in which the Commission declined to apply the captive production provision as to the production of pre-engineered metal building systems ("PEMBs") and PEMB kits, since the FSS component of those kits remained subject to the scope.[7] In affirming the Commission's decision not to apply the captive production provision, the Federal Circuit stated as follows:

> We conclude that the Commission correctly determined that the captive production provision does not apply here. The Commission reasonably determined that complete PEMBs are fully assembled buildings that are out-of-scope, whereas PEMB kits containing FSS components of PEMBs that are later assembled into complete PEMBs are in scope. . . . Because both FSS components of PEMBs and PEMB kits are within the domestic like product scope, . . . neither can qualify as a downstream article under the captive production provision.[8]

[5] *Hot Rolled Steel Products from Argentina and South Africa*, Inv. Nos. 701-TA-404 and 731-TA-898 & 905, USITC Pub. No. 3446, App. A-1 (Aug 2001) (Final), Def. Br. at 35.

[6] 81 F.4th 1242 .

[7] Inv. Nos. 701-TA-616-617 and 731-TA-1432-1434, USITC Pub. 5031 (Mar. 2020) (Final) at 42-43.

[8] *Full Member Subgroup*, 81 F.4th at 1255.

For the same reason that PEMBs and PEMB kits were not considered "downstream articles" because of the subject FSS they contain, formulated herbicide products—or at least the 2,4-D component they contain—cannot be considered "downstream articles," either.[9]

Thus, because the 2,4-D that Corteva internally transfers does in fact enter the merchant market via the 2,4-D component of the formulated herbicides that Corteva produces and sells domestically, the "captive production" provision of the statute cannot be applied here.

## II. THE COMMISSION'S FINDING THAT SUBJECT IMPORT VOLUME WAS SIGNIFICANT WAS NEITHER REASONABLY EXPLAINED NOR SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. The Statute Does Not Require the Commission to Consider Set Criteria When Assessing the Significance of Import Volumes, But the Commission Routinely Supplies Context for Significance and Must Provide a Reasoned Explanation for its Findings

The statute does not articulate the criteria by which the Commission determines whether subject import volume is "significant," other than directing it to consider the volume, or any increase in that volume, "either in absolute terms or relative to production or consumption in the United States." 19 U.S.C. § 1677(7)(C)(i). Notwithstanding, in *Government of Israel, Ministry of Economy & Industry v. United States*, No. 24-197, 2026 WL 1972194 (Ct. Int'l Trade June 8, 2026), the court found that the Commission's volume finding was not supported by substantial evidence because the Commission "failed to draw a rational connection between the record evidence and why subject import volumes were 'significant,'" offering "only a conclusory

[9] In its *Views*, the Commission noted (in response to Plaintiff PBI-Gordon's citation to *Full Member Subgroup* in its pre-hearing brief) that this case was inapposite as the assembly in question was performed by third parties, not the domestic producers themselves, which was the basis for the Commission to decline to apply the "captive production" provision in *Fabricated Structural Steel*. *Views* at 43 n.158 (P.R. 164, C.R. 200). Even if true, this distinction is meaningless. Regardless of who does the production, the fact remains that in both cases, a portion of the domestic like product (*i.e.*, the 2,4-D component of formulated herbicides) is still being sold into the merchant market.

statement" that the volumes were significant in absolute and relative terms. That reasoned explanation requirement is settled and applies regardless of the criteria by which the Commission determines the significance of subject import volumes. *See Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1335 (Ct. Int'l Trade 2001); *see also OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1312 (Ct. Int'l Trade 2023).

Congress made "significance" a context-dependent inquiry: "For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant." S. Rep. No. 96-249, at 88 (1979); *see* Pls.' Br. at 45. This Court has echoed that principle. *See USX Corp. v. United States*, 655 F. Supp. 487, 490 (Ct. Int'l Trade 1987) (holding that the significance of a quantity of imports, not absolute volume alone, must guide the analysis); *see also Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1309 (Ct. Int'l Trade 2006) (holding that market characteristics such as price-sensitivity and fungibility can make volume and market-share movements more or less significant). *OCTAL* confirms that the Commission "must evaluate what is 'significant' in a volume determination on a case-by-case basis" because "{w}hether a particular volume of imports is 'significant' varies across industries and circumstances." *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1301 (Ct. Int'l Trade 2021).

The case law on how the Commission must treat market context in the volume inquiry is not settled: *Compare Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (Ct. Int'l Trade 2019) (holding that the Commission *may* take pertinent conditions of competition into account in assessing significance); *American Alliance for Hardwood Plywood v. United States*, 392 F. Supp. 3d 1298, 1311 (Ct. Int'l Trade 2019) (same) *with OCTAL*, 539 F. Supp. 3d at 1300 (holding that the Commission is not *required* to consider "the effects of subject imports in its

volume analysis because the statute expressly ties "conditions of competition" to the impact analysis, 19 U.S.C. § 1677(7)(C)(iii)).

That the Commission is *permitted* to rest on raw volume and market-share figures does not make that recitation *reasoned* in every case. The Commission's own practice proves the point: where market conditions bear on significance, the Commission contextualizes volume data. *See, e.g.*, *Truck and Bus Tires from China*, Inv. Nos. 701-TA-556 & 731-TA-1311, USITC Pub. 4877 (Apr. 2019) (Final) (Remand) at 24, *aff'd sub nom. United Steel Workers Int'l Union v. United States*, 425 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) (crediting domestic industry's loss of share in the specific market segment where subject imports were concentrated); *Pentafluoroethane (R-125) from China*, Inv. Nos. 701-TA-662 & 731-TA-1554, USITC Pub. 5281 (Feb. 2022) (Final) at 25 (reading import-volume trends against an intervening anticircumvention inquiry); *Hydraulic Magnetic Circuit Breakers from South Africa*, Inv. No. 731-TA-1033, USITC Pub. 3600 (June 2003) (Preliminary) at 14–15 (finding volume *not* significant despite sharply rising ratio to domestic production due to pertinent market conditions); *Laminated Woven Sacks from China*, Inv. Nos. 701-TA-450 & 731-TA-1122, USITC Pub. 4025 (July 2008) (Final) at 37–38 (discounting subject-import share trends due to domestic industry's youth and low baseline).

The Commission does not dispute that it has contextualized volume in these determinations; it argues only that doing so is discretionary. Def. Br. at 49. But that the Commission was not *required* to consider these conditions does not mean it was free to ignore them without explanation: having repeatedly recognized that significance turns on pertinent market conditions, the Commission was obligated to explain why those conditions did not bear on significance here.

The recent decision in *Government of Israel*, 2026 WL 1972194, is instructive. The Court did not hold that a conditions-of-competition analysis is categorically mandated in every volume determination, but it did hold that the Commission must provide a reasoned explanation for its findings, regardless of whether a context analysis is mandatory. *See Nippon Steel Corp.*, 182 F. Supp. 2d at 1335; *OCP S.A.*, 658 F. Supp. 3d at 1312.

The Commission argues that it "is not required to consider the reasons for increased subject import volumes in assessing whether the volume or increase in volume is significant," Def. Br. at 47, and that any argument about why imports entered the market belongs to the impact analysis, Def. Br. at 47-48.

Plaintiffs do not ask the Court to resolve that unsettled question, nor do they contend that the Commission was legally *compelled* to import the "conditions of competition" clause into its volume analysis. Nor do Plaintiffs raise "volume effects." Plaintiffs' contention is narrower: whatever the outer bounds of the Commission's discretion, the volume provision's operative term is "significant," 19 U.S.C. § 1677(7)(C)(i), and the Commission must explain why the volume it observed was significant. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ( "a rational connection between the facts found and the choice made."). In this one-producer market, the Commission did not.

**B. The Commission's Cited Authorities Are Inapposite**

The Commission's principal authority, *Tenaris Bay City v. United States*, 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025), does not control. Def. Br. at 48. Plaintiffs do not dispute *Tenaris'* holding: the statutory "conditions of competition" clause is located in the impact provision, and the Commission is not required to conduct a separate conditions-of-competition analysis in its volume determination. *Tenaris Bay City*, 789 F. Supp. 3d at 1373-74. Plaintiffs acknowledge that in *Tenaris* the court sustained the Commission's volume analysis based on absolute volume,

volume relative to apparent U.S. consumption, and the ratio of imports to domestic production as consistent with 19 U.S.C. § 1677(7)(C)(i).[10] Plaintiffs' argument does not require this Court to disturb that result.

However, *Tenaris* does not answer the question presented here. The *Tenaris* court did not consider a market in which the vast majority of the like product is internally consumed and the sole domestic producer of the like product had stepped back from supplying the merchant market, such that the statutory benchmark no longer captures what it is designed to measure.

That scenario describes this case. Corteva was the only domestic producer of 2,4-D acid, and the record establishes that it withdrew from and declined to serve the merchant market during much of the POI. Pls.' Br. at 49–56; *Views* at 41–49, 56–57 (C.R. 200). When the lone domestic supplier is not competing for merchant sales, the ratio of subject imports "relative to production or consumption" no longer reflects import penetration of a contested market; it largely reflects the vacuum the domestic producer left behind. An import volume that is high only because the domestic industry chose not to supply the market does not, without explanation, establish that import volume is "significant." The Commission was therefore obligated to explain why its volume metrics remained probative of significance—precisely the reasoned connection that *Tenaris'* facts did not require, and that *Government of Israel* holds the statute demands. *Gov't of Israel*, 2026 WL 1972194, at *8.

The Commission's reliance on *OCTAL* and *Adisseo España* is similarly misplaced because those cases address different arguments. In *OCTAL*, the plaintiff sought to inject its non-price reasons for increasing imports—quality, carbon footprint—into the volume analysis, and the court

[10] To the extent the Commission reads *Tenaris* to license a bare numerical recitation in any market regardless of whether the statutory benchmark is distorted, that reading is contestable as *Tenaris* is presently on appeal. *See Tenaris Bay City*, 789 F. Supp. 3d 1352, *appeal docketed*, No. 2025-2034 (Fed. Cir. Aug. 20, 2025); Def. Br. at 48.

declined to require the Commission to weigh the *effects* of subject imports there. *OCTAL*, 539 F. Supp. 3d at 1299–1301. In *Adisseo España*, the plaintiff challenged the *impact* of the imports and the court concluded that plaintiff's "volume effects" arguments were more appropriately considered in reviewing the Commission's impact analysis because those arguments challenged the consequences of increased imports for the domestic industry. *Adisseo España S.A. v. United States*, No. 21-562, 2023 WL 8866562, at *16 (Ct. Int'l Trade Dec. 18, 2023).

Here, Plaintiffs do not ask the Commission to measure the downstream effects of imports in the volume analysis; they ask only that the Commission explain why the observed volume was "significant" given the undisputed, Commission-found market condition that the lone domestic acid producer had stepped back from merchant sales. That is a significance argument, not a volume-effects argument. Likewise, *ITG Voma Corp. v. United States*, 253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), Def. Br. at 47, addressed a plaintiff's attempt to fold the domestic industry's *capacity and financial condition* into the effects analysis; Plaintiffs do not contend that Corteva's financial performance or capacity independently rendered the volume insignificant.

**C. On this Record, the Commission's Volume Finding Was Not Reasoned**

This is not an ordinary merchant market. Corteva was the sole domestic producer of 2,4-D acid; it internally consumed the overwhelming majority of its acid production to make proprietary Enlist® herbicides; and it acknowledged turning merchant-market customers away in 2021 and 2022 to prioritize internal production. Pls.' Br. at 49–56; *Views* at 56–57 (C.R. 200). In a market with one domestic acid supplier that declined to serve the merchant trade, the raw fact that imports supplied a large and rising share does not, without more, establish that the import volume share was "significant."

The Commission does not dispute that the volume section of the views omitted this analysis; it concedes that "the Commission did not address respondents' contention that imports

were pulled into the 2,4-D market in its analysis of volume," and defends the omission only on the ground that the Commission addressed the point elsewhere, in its price-effects and impact discussions. Def. Br. at 48 n.30; *see also* Def. Br. at 49-50. That concession is dispositive and the Commission does not cure it.[11]

Plaintiffs pressed these points throughout the investigation: they argued that the increase in subject import volume could not be evaluated in isolation because Corteva's inability and unwillingness to supply the merchant market fundamentally altered purchasing patterns during the POI. *See, e.g.*, PBI-Gordon Prehearing Br. at 41–42 (PR. 126); Drexel Posthearing Br. at 11–13 (C.R. 162); Nufarm Posthearing Br. at 3–6 (C.R. 164). They highlighted Corteva's testimony that in 2021 and 2022 it told purchasers, "we can't supply you this year because we have raw material constraints, **we need to prioritize our internal products**," Hearing Tr. at 77–79 (P.R. 135) (emphasis added), and that even after Corteva's raw material constraints were resolved in 2023 Corteva did not "actively go{} out to promote {its} products" and "there were not many conversations," *Id.* at 46–47. Plaintiffs also pointed out that Corteva presented only one price quote sent to a customer during the POI. *See* Pls. Br. at 50 (citing Corteva Posthearing Br. at Exhibit 5-11 (C.R. 163)); *see also* Def.-Int. Br. at 26. Moreover, Corteva's commercial shipments of 2,4-D to the merchant market declined to **[ ]** in interim 2024, and Corteva reduced its swap shipments to **[ ]**. *Final Staff Rpt.* at Tables 3.7 and 3.8 (C.R. 179).

Plaintiffs further argued that purchasers consistently reported turning to imports because Corteva could not or would not supply, not because imports became more attractive. Pls. Br. at 54-56. However, the Commission never meaningfully addressed those arguments in evaluating

[11] Corteva merely recited the numbers without explaining why the subject import volume was significant. *See* Def.-Int. Br. at 19.

whether the increase in subject import volume was "significant." *See Views* at 56-57 (C.R. 200). While Corteva testified that it "had eight customers" including Plaintiffs **[** **]** and non-parties such as **[** **]** because 2,4-D is "a very concentrated industry," Hearing Tr. at 215 (P.R. 135), all of the customers except **[** **]** reported that they bought subject imports instead of the domestic like product for non-price reasons. *Final Staff Rpt* at Table 5.18 (C.R. 179).

Notwithstanding this ample record evidence, the Commission merely recited numerical increases in subject import volume and apparent U.S. consumption before concluding that the increase was significant. *See Views* at 56-57 (C.R. 200). Neither the Commission nor Corteva provided substantial evidence to support the Commission's failure to consider the purchasers' accounts in its volume analysis. Def. Br. at 46-50; Def.-Int. Br. at 22-30. That is the type of reasoning this Court rejected in *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1359 (Ct. Int'l Trade 2001) (holding that the Commission's reliance on import-volume data could not substitute for a reasoned explanation addressing material arguments and contrary evidence bearing on the significance of those volumes).

The Commission responds that this is not a supply-shortfall case, contending that Corteva "had ample capacity to both supply 2,4-D for internal consumption as well as supply volume to the merchant market in 2023 and interim 2024," and that the increased volumes of subject imports therefore "could not have reflected any inability of the domestic industry to serve the merchant market." Def. Br. at 48-49. On that basis, the Commission distinguishes *OCP* and *Altx* as limited to cases where imports fill demand the domestic industry cannot meet "because of incapability or lack of viability." Def. Br. at 48-49.

That response misapprehends Plaintiffs' argument. Plaintiffs do not contend that Corteva lacked the capacity to supply the merchant market; they contend that Corteva *declined* to supply it: Corteva made no merchant-market offers and issued no price quotes during 2023, testified that it did not "actively go{} out to promote {its} products," and directed customers to other suppliers. *Views* at 41-49, 56-57 (C.R. 200). A producer with unused capacity that does not offer, quote, or promote its product has removed itself from merchant competition just as surely as one that cannot supply. The significance of subject import volume in that setting requires a reasoned explanation, and the Commission's capacity point—which addresses only whether Corteva *could* have supplied—does not fill that gap.

**D. Conclusion**

Because the Commission recited volume and market-share figures without explaining why they were "significant" in a market dominated by a single domestic acid producer that had withdrawn from merchant sales, its volume determination was not the product of reasoned decision-making and is unsupported by substantial evidence. 19 U.S.C. § 1677(7)(C)(i); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Court should remand for the Commission to explain, in the first instance, why subject import volume and any increase in that volume were significant in the circumstances of this one-acid-producer market.

## III. THE COMMISSION'S FINDING OF SIGNIFICANT PRICE EFFECTS WAS NEITHER REASONABLY EXPLAINED NOR SUPPORTED BY SUBSTANTIAL EVIDENCE

The Commission's response does not cure the fundamental flaws in the Commission's price effects analysis. The Commission fails to explain why it disregarded record evidence showing that availability—not price—often drove purchasing decisions, failed to reconcile its significant underselling finding with market-share trends, selectively relied on lost-sales responses, and continued to defend Corteva's unsupported assertion that subject imports priced Corteva out of the merchant market. Def. Br. at 50-68. Accordingly, the Commission provides no basis to sustain its affirmative price effects determination. Corteva echoes the Commission's arguments, selectively pointing to the quarters with underselling and their unevaluated data on pricing while declining to address the issues Plaintiffs identified with the data. Def-Int. Br. at 19-22.

### A. The Commission Failed to Sufficiently Consider Availability in Its Price Analysis

The Commission dodges Plaintiffs' argument that the Commission improperly ignored the critical role of availability in purchasing decisions. *See* Def. Br. at 50-53. Specifically, the Commission discusses its recognition of availability in its *substitutability* analysis as if the Commission considered availability in its *price* analysis. *Id.* at 51-52. In fact, the Commission fails to acknowledge how—or if—it considered availability in determining what drove purchasing decisions while acknowledging that it "identified availability as a very important purchasing factor." *Id.* at 52 (citing *Views* at 50-51 nn.192-93 (C.R. 200)). The Commission's argument is misplaced because, as pointed out by Plaintiffs' opening brief, interchangeability itself sheds no light on which factors actually drove purchasers' choices during the POI. *See* Pls. Br. at 57; *see also Final Staff Rpt*. at 2.22 (C.R. 179) (explaining that interchangeability is limited to assessing

only whether the domestic like product and subject imports "can generally be used in the same applications as imports from China and India").

The Commission's conflation of the Commission's substitutability analysis with its price-effects analysis is also inconsistent with this Court's precedent recognizing that interchangeability does not, by itself, establish the significance of price competition. Rather, the Commission must consider whether other competitive factors diminish or outweigh the role of price in purchasers' decision-making. In *Coalition for Fair Trade of Hardwood Plywood v. U.S. International Trade Commission*, this Court sustained the Commission's determination that, although the domestic and imported products were highly substitutable and price was an important purchasing consideration, price competition nevertheless was constrained because purchaser questionnaire responses showed that quality—not price—was the most important purchasing factor for most purchasers. 180 F. Supp. 3d 1137, 1146 (Ct. Int'l Trade 2016). Likewise, in *General Motors Corp. v. United States*, the Court upheld the Commission's conclusion that subject imports did not have significant price effects where competition in the relevant market was driven more by product features than by price. 827 F. Supp. 774, 784 (Ct. Int'l Trade 1993). More importantly, this Court has remanded a Commission determination on the grounds that it was "insufficient merely to acknowledge that non-price factors are considered 'very important' without discussing the nature of these factors in the industry or relating them to its overall determination, as such factors may eclipse the importance of price in purchaser decision-making." *Nippon Steel*, 182 F. Supp. 2d at 1346.

These decisions recognize a common principle: the Commission's price-effects analysis must evaluate the factors that actually drive purchasing decisions in the marketplace, even where the products themselves are interchangeable.

Here, the Commission expressly found that availability was "a very important purchasing factor" and the purchaser questionnaire responses repeatedly identified product availability as a principal consideration during the period of investigation. *Views* at 50-51 nn.192-93 (C.R. 200); *Final Staff Rpt.* at 2.13-2.17 (C.R. 179) (Table 2.9 showing that fourteen of fifteen responding purchasers rated availability "very important."). Likewise, the Staff Report documented that numerous purchasers (1) experienced domestic supply constraints; (2) reported that Corteva phased out commodity supply, prioritized Enlist® production, or otherwise could not or would not supply sufficient quantities; and (3) explained that they increased purchases from China and India because of Corteva's lack of available supply or refusal to supply. *See id.* at 2.7-2.8; 2.16-2.17 (C.R. 179).

Incomprehensibly, after acknowledging the importance of availability when discussing conditions of competition, the Commission merely referred to "the at least moderate-to-high degree of substitutability" and assumed "the importance of price in purchasing decisions" without addressing availability to find that subject imports significantly undersold the domestic like product during the POI. *Views* at 63; *see also id.* at 50, n.190 (C.R. 200) ("Our finding of at least a moderate-to-high degree of substitutability between domestically manufactured and subject imported 2,4-D accounts for the high degree of interchangeability between domestically produced 2,4-D and subject imports, as well as **availability considerations**.") (emphasis added). The Commission's continued reliance on its discussion of availability in the substitutability analysis distracts from the fact that it never evaluated availability in determining whether subject imports had significant price effects. *See Chemours*, 443 F. Supp. 3d at 1329.

The Commission's attempt to mischaracterize Plaintiffs' argument regarding availability as "an improper invitation for the Court to reweigh the evidence" on the grounds that each

Commission investigation is *sui generis* is misleading and fails to consider Court precedent. Def. Br. at 52 (citations omitted). While Plaintiffs do not dispute that each Commission investigation is *sui generis*, this Court has held that the Commission "may not treat two like situations differently without explanation." *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007). As discussed in Plaintiffs' opening brief, the Commission treated the underlying evidentiary record for the instant case and certain prior like situations differently without explanation. *See* Pls. Br. at 58. Specifically, where purchaser questionnaire responses showed that non-price factors were more important than price, the Commission found in other investigations that those non-price factors can constrain or outweigh price-based competition even when the products are interchangeable. *See id.* at 58 (citing *Tin Mill Products from Canada, China, Germany, and South Korea*, Inv. Nos. 701-TA-685 and 731-TA-1599-1601 and 1603, USITC Pub. 5492 (Feb. 2024) (Final) at 39; and *Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos 731-TA-1575 and 731-TA-1577, USITC Pub. 5392 (Final) (Jan. 2023) at 28 ).

Here, the Commission deviated from at least those two like situations without explanation, disregarded the significant record evidence that availability was more important than price, and improperly focused on the importance of price based solely on interchangeability. *See Royal Thai Gov't*, 502 F. Supp. 2d at 1341. The Commission's brief conceded this inconsistency but still failed to either explain the Commission's reason for treating similar situations differently or explain why the Commission focused solely on one aspect of price in the record to the exclusion of another. Def. Br. at 52. Accordingly, this Court should remand the Commission's determination as to price effects because of the Commission's failure to factor availability into its price analysis.

1. Record Evidence Belies the Commission's Finding of Significant Underselling

The Commission and Corteva devote considerable attention to defending the Commission's finding that subject imports significantly undersold the domestic like product. Def. Br. at 53-58. However, neither response addresses Plaintiffs' central argument: the Commission failed to explain why the observed market outcomes were inconsistent with its theory that underselling drove market share gains. The Commission and Corteva simply restate the Commission's conclusion without addressing that disconnect.

The chronology of the record does not support the Commission's theory that significant underselling enabled subject imports to capture market share from the domestic industry and ultimately priced Corteva out of the merchant market. *Views* at 58-72 (C.R. 200). Based on both the price data and the purchase cost data, subject imports achieved their largest increase in volume and gained **[ ]** percentage points of market share between 2021 and 2022, precisely when the pricing comparisons showed that subject imports mostly *oversold* the domestic product. *See* Pls. Br. at 61-62 (citation omitted). By contrast, when pricing comparisons showed subject imports mostly at lower prices in 2023, subject import volume declined and subject imports did not gain additional market share. *Id.* The record evidence indicates that subject imports' merchant-market share increased from **[ ]** percent in 2021 to **[ ]** percent in 2022 and then remained unchanged at **[ ]** percent in 2023. *Final Staff Rpt.* at 4.19 (C.R. 179). Likewise, in the total market, subject imports' share increased from **[ ]** percent in 2021 to **[ ]** percent in 2022 and remained at **[ ]** percent in 2023. *Id.* at 4.17. Indeed, the Commission itself recognized that "{i}nstances of overselling . . . occurred mostly in 2022, whereas instances of underselling occurred mostly in 2023." *See Views* at 61 (C.R. 200).

Importantly, neither the Commission nor Corteva disputes those underlying trends. Instead, the Commission emphasizes that underselling became more prevalent during 2023 and that subject imports ultimately captured market share over the period of investigation. *See* Def. Br. at 53-58. Corteva likewise emphasizes "pervasive underselling" and asserts that imports displaced Corteva. *See* Def.-Int. Br. at 19-21. Those arguments merely restate the Commission's conclusion without explaining *why* the substantial market share gains occurred during a period dominated by overselling while subject imports failed to gain additional market share during the period dominated by underselling, or how the Commission's conclusion can stand in the face of substantial contradictory record data. *See generally Views* at 57-72 (C.R. 200).

The question is not whether price mattered or whether subject imports ultimately gained market share. Instead, the question is why the Commission attributed those gains to underselling when the timing of the gains corresponds with the period during which purchasers consistently reported turning to imports because Corteva could not or would not supply them. Pls. Br. at 57-62.

The Commission attempts to distract from this disconnect by emphasizing that underselling became more prevalent during 2023 after Corteva's supply constraints had eased. *See* Def. Br. at 54. But even accepting that premise, the Commission still does not explain why subject imports failed to gain additional market share during the period when underselling increased. *See id.* Corteva likewise argues that the Commission properly relied on pervasive underselling and evidence that import prices eventually fell below Corteva's variable costs. Def.-Int. Br. at 20-21. But that argument addresses the level of prices, not whether the Commission demonstrated that those prices caused the observed competitive outcomes reflected in the record.

To rectify this flaw, the Commission should have explained how the chronology of the record data supports that conclusion because "{t}he overall frequency of underselling by itself says nothing about causation, and does not absolve the Commission of its obligation to analyze underselling in terms of trends in the domestic industry's performance." *Altx, Inc. v. United States*, No. 00-09-00477, 2002 WL 1560884, at *12 (Ct. Int'l Trade Jul. 12, 2002). Instead, the Commission acknowledged that overselling predominated during the period of market share gains, that underselling predominated after those gains had already occurred, that purchasers repeatedly cited product availability as a critical purchasing factor, and that purchasers shifted to imports because Corteva could not or would not supply them. *Views* at 35-37, 49-50 (C.R. 200). Yet it never reconciled those findings with its conclusion that underselling *caused* the market-share shifts, contravening this Court's precedent. *See DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1358 (Ct. Int'l Trade 2020) ("*DAK I*") (remanding Commission's determination due to contradictory evidence or evidence from which conflicting inferences could be drawn that the Commission did not adequately address); *see also DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1367-73 (Ct. Int'l Trade 2021) ("*DAK II*") (subsequently holding that the Commission's remand determination that supply constraints caused domestic industry market share loss is based on substantial evidence).

Accordingly, the Commission and Corteva have not cured the principal defect in the Commission's reasoning. They simply repeat that subject imports undersold and ultimately gained market share, without explaining why the chronology of the record evidence contradicts its causal theory. Def. Br. at 53-58; Def.-Int. Br. at 19-21. Because the Commission failed to articulate the required rational connection between the pricing evidence and the actual market-

share shifts reflected in the record, its price-effects determination remains unsupported by substantial evidence. *See DAK I*, 456 F. Supp. 3d at 1358.

**B. The Commission's Finding that Subject Import Underselling Caused Lost Sales and Market Share was Not Supported by Substantial Evidence**

1. The Commission Failed to Address the Commission's Selective Reliance on Lost Sales Responses

A finding supported by substantial evidence requires consideration of the record as a whole, including evidence that detracts from the agency's conclusion. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). The Commission mischaracterizes Plaintiffs' argument concerning the Commission's treatment of purchaser lost sales responses for its finding of significant underselling. Def. Br. at 59-68. Plaintiffs do not contend that the Commission was required to base its significant underselling finding on the volume of confirmed lost sales or that the absence of confirmed lost sales alone required a negative determination. Rather, Plaintiffs' point is considerably narrower: once the Commission chose to rely on purchaser lost sales responses as affirmative support for its underselling finding, it could not selectively rely on *only* the portions of those responses favorable to its conclusion while disregarding the portions that directly undermined its causation theory. Pls. Br. at 62-65. That is precisely what occurred here.

The Commission sidesteps Plaintiffs' argument by arguing that the Commission reasonably relied on the fact that five of the six purchasers reported subject imports were priced lower, while emphasizing that the Commission did not rely on the relatively **[ ]** volume of confirmed lost sales. Def. Br. at 57-59. The issue is not that the Commission did not rely on the volume of confirmed lost sales but that the Commission relied on only one portion of the purchaser responses—whether purchasers perceived subject imports as lower priced—while disregarding the same purchasers' explanations that they purchased subject imports for *non-price* reasons. *Id.*

Considering this Court's precedent, the Commission should have addressed why it disregarded the other portions of the purchaser responses. *See Altx, Inc.*, 167 F. Supp. 2d at 1366.

The Commission improperly attempts to compensate for its selective reliance on certain lost sales responses by arguing that the purchasers who reported that they purchased subject imports for non-price reasons also reported that the subject imports were priced lower than the domestic like product. *See id.* at 57. This is a circular argument. The relevant question was not whether purchasers recognized that imports were cheaper, but *why* the purchasers purchased subject imports instead of the domestic product. A purchaser's observation that imported merchandise was less expensive does not establish that price drove the purchasing decision when that same purchaser expressly identified lack of domestic availability as the actual reason for the purchase. The Commission therefore extracted only the portion of the purchaser responses supporting its preferred narrative while disregarding the contrary evidence explaining the actual purchasing decision, which justifies a remand. *See OCP S.A. v. United States*, 2025 WL 1837257 at *16-18 (Ct. Int'l Trade Apr. 22, 2025) ("*OCP II*") (remanding Commission's underselling finding to provide a rational explanation of detracting evidence including lack of confirmed lost sales based on price).

Nor do the Commission's citations to *Gifford-Hill Cement Co. v. United States*, 615 F. Supp. 577, 585 (Ct. Int'l Trade 1985) and *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1057 (1995) bolster its case. Def. Br. at 58 (citation omitted). Both cases simply recognize that lost sales evidence is not dispositive, not that the Commission can selectively rely on purchaser responses while disregarding the portions of those same responses that contradict the Commission's causal theory. *See generally Gifford-Hill Cement*, 615 F. Supp. 577; *Acciai Speciali*

*Terni*, 19 CIT 1051. Accordingly, the Commission's selective reliance on lost sales responses warrants remand.

2. The Commission Failed to Reconcile Corteva's *Post Hoc* Rationalization with Record Evidence

The Commission and Corteva failed to explain how Corteva's *post hoc* rationalization of **[ ]** can be reliable in light of the record evidence that consistently presented a different explanation. Def. Br. at 66-68. Plaintiffs challenge the Commission's reliance on Corteva's testimony that subject imports priced Corteva out of the market when there is compelling record evidence that Corteva's argument is a *post hoc* rationalization after its strategic decision to voluntarily withdraw from the merchant market. Corteva's *post hoc* explanation does not relieve the Commission of its duty to evaluate competing causal evidence and ensure that injury attributable to other factors was not improperly attributed to subject imports. *Taiwan Semiconductors Industry Ass'n v. United States International Trade Commission*, 266 F.3d 1339, 1345 (Fed. Cir. 2001). The Commission's "price-out" theory fails under those standards.

The Commission merely repeats the Commission's reliance on testimony from Ms. Ericson, Vice President of Corteva's Weed Control Segment:

> "So we could see what some of the export costs are coming out of China. We typically have an estimate of what the difference is between the export cost and what the importers would be paying for that in the market. We also have . . . industry intelligence that shares with us what . . . those prices would be."

*See* Def. Br. at 60-61 (citing *Views* at 70, n.278 (C.R. 200)); Hearing Tr. at 59 (Ericson) (P.R. 135). Moreover, the Commission fails to account for Ms. Ericson's acknowledgement that Corteva told its purchasers: "we can't supply you this year because we have raw material constraints, we need to prioritize our internal products." *Id.* at 79. Ms. Ericson also testified that Corteva did not

"actively go{} out to promote our products" and that "there were not many conversations." *Id.* at 46-47.

Consistent with this testimony, all of Corteva's customers except **[ ]** testified to the lack of domestic availability during the POI:

- Nufarm: "Corteva informed Nufarm that Corteva would no longer supply 2,4-D to Nufarm following a final shipment scheduled for October {20}22." Hearing Tr. at 108 (Barham) (P.R. 135).

- PBI-Gordon: "Corteva declined to supply {PBI-Gordon} with any more 2,4-D acid since the beginning of 2022, . . . and even though we were willing and happy to resume purchases of 2,4-D acid from Corteva, and to pay a premium for their product, they have not approached us with any offers to supply 2,4-D acid." Hearing Tr. at 102 (Wolf) (P.R. 135).

- **[ ]**: **[ ] [ ]** U.S. Purchaser Questionnaire Response at II-3(c) (C.R. 107).

- **[ ]**: **[ ] [ ]** U.S. Purchaser Questionnaire Response at II-2 (C.R. 112).

- **[ ]**: **[ ] [ ]** U.S. Purchaser Questionnaire Response at III-14(b) (C.R. 114).

The testimony of Corteva's witness has no support in the record. Corteva attempts to fill this evidentiary gap by relying on customer quotations that Corteva allegedly extended and purchasers allegedly rejected. Def.-Int. Br. at 26-27. However, except for the price quote for **[ ]**, the other **[ ]** solicitations on which Corteva relies occurred during late 2024—*after* **[ ]**. *Id.* Those post-petition solicitations cannot

supplant contemporaneous evidence explaining why Corteva withdrew from the merchant market during the period of investigation.

The Commission supports its position that subject imports priced Corteva out of the merchant market in interim 2024 merely by restating that Corteva's capacity utilization decreased in 2023 and interim 2024 and that Corteva had ample unused capacity to serve the merchant market. Def. Br. at 59-60. Similarly, Corteva merely recites its capacity numbers during the POI to make a conclusory argument that Corteva was economically foreclosed. Def.-Int. Br. at 28-30. If Corteva possessed ample capacity, however, the Commission was required to explain why that capacity remained idle while Corteva **[ ]** during interim 2024 and made **[ ]** U.S. commercial shipments in interim 2024. *Final Staff Rpt* at Table 3.8 (C.R. 179); *see also Views* at 41, n.154 (C.R. 200).

The Commission relies on *Nippon Steel Corp.*, 458 F.3d at 1356 to argue that the Commission's role includes assessing the proper weight to accord to testimony. Def. Br. at 60-61. However, this reliance is misplaced because the Commission failed to address voluminous contradictory record evidence and its brief does not provide a reason for that omission. Def. Br. at 59-68. As the Federal Circuit explained in *Taiwan Semiconductors*, the Commission must ensure that injury attributable to other causes is not improperly attributed to subject imports. 266 F.3d at 1345. The Commission's analysis does not satisfy that obligation.

3. The Commission Fails to Defend Its Methodologically Flawed Variable-Cost Analysis

The Commission and Corteva fail to rehabilitate the Commission's reliance on Corteva's unsubstantiated estimated variable costs, Pls. Br. at 67-69, to conclude that subject imports priced Corteva out of the merchant market. Def. Br. at 59-66; Def.-Int. Br. at 21-22. The Commission principally argues that Plaintiffs failed to exhaust any challenge to the Commission's variable-cost

methodology and that the Commission reasonably relied on the "best available information" in the record. Def. Br. at 64. Corteva similarly argues that Corteva could not rationally continue selling once subject import prices fell below its variable costs. Def.-Int. Br. at 20-21. Both arguments miss Plaintiffs' point. Neither the Commission nor Corteva addresses the methodological flaws identified in Plaintiffs' opening brief.

The Commission attempts to justify the Commission's reliance on Corteva's unsubstantiated estimated variable costs by arguing that "Staff reviewed the calculations of cost items included within Corteva's COGS and found its record and methodology for commercial sales and swaps to be reasonably in accordance with generally accepted accounting principles." Def. Br. at 64 (citing Corteva Verification at 7-8 (C.R. 184)). Similarly, Corteva merely states that "Corteva's production cost data submitted in its questionnaire responses were accurate and were verified by ITC Staff." Def.-Int. Br. at 21. These conclusory statements overstate the extent to which the Commission verified Corteva's variable-cost analysis. Specifically, neither the Staff nor the Commission verified Corteva's single-year estimate that approximately **[ ]** percent of its "other factory costs" were variable; nor did the Commission explain the Commission's adjustment for the "product mix issue" acknowledged by the Commission for Corteva's reported variable costs reflecting COGS for its total market shipments. Pls. Br. at 67-68; Corteva Verification at 7-8 (C.R. 184).

Neither the Commission nor Corteva explains why the Commission compared those estimated costs only against importers' landed-duty-paid ("LDP") purchase costs and official import statistics while disregarding Corteva's own contemporaneous sales as reflected in the quarterly pricing data. Those quarterly pricing comparisons show that prices generally remained *above* Corteva's claimed variable cost of approximately $**[ ]** during much of 2023,

undermining the Commission's conclusion that prevailing market prices necessarily forced Corteva to cease supplying non-importer customers such as **[ ]** and **[ ]**. Pls. Br. at 66-68; Corteva U.S. Producers' Questionnaire Response at IV-25 (C.R. 90).

In addition, nothing in the record demonstrates that the Converters' reported value-added percentages represent Corteva's own conversion costs, much less that they may reasonably be substituted for Corteva's costs in determining whether Corteva could have profitably sold 2,4-D acid. Def. Br. at 64-65. In fact, as explained in Plaintiffs' opening brief, critical questions remained the reliability of the pricing data remained unresolved through the closing stages of the Investigation. Pls. Br. at 59-62. Given the late timing of U.S. importer **[ ]** submission of the revised price and purchase cost data, the Commission explicitly acknowledged that Staff was "unable to fully evaluate the discrepancies alleged in Petitioner's final comments or correspond with U.S. importer **[ ]** to determine whether their data may be erroneous." *Id.* at 59-60; *Views* at 59 (C.R. 200). Nevertheless, the Commission likewise performed no validation or sensitivity analysis to determine whether reasonable variations in those assumptions would materially affect its conclusions. *Id*. Instead, it simply accepted the resulting estimate as corroboration of Corteva's variable-cost theory. *See Views* at 69-71 (C.R. 200).

Ultimately, the Commission's assertion that the Commission relied on the "best available information" does not address Plaintiffs' argument. Def. Br. at 64. The "best available information" standard does not relieve the Commission of its obligation to base its findings on substantial evidence or to explain why its methodology reasonably supports its conclusions. Here, the Commission relied on unsubstantiated estimates, substituted third-party converter data for Corteva's own costs, and ignored contemporaneous pricing evidence that undermined its conclusion. *Views* at 70-71 (C.R. 200). Neither the Commission nor Corteva explains how that

methodology constitutes substantial evidence supporting the Commission's finding that subject imports priced Corteva out of the merchant market.

4. The Commission Failed to Explain Why Corteva's Price-Out Theory Could Not Be Reconciled with the Actual Pricing Record

The Commission's response does not reconcile Corteva's price out theory with the pricing evidence collected during the investigation. Def. Br. at 64-68. Quarterly pricing data show that subject import prices **[ ]** from the first quarter of 2021 through approximately the third quarter of 2023 before **[ ]** in the period of investigation when there was almost no head to head competition between subject imports and the domestic like product. Pls. Br. at 66. Not only did the Commission not reconcile the pricing data, but the Commission also acknowledged that the Commission made no findings of significant price depression or suppression by subject imports. Def. Br. at 17 (citing *Views* at 66 n.265 (C.R. 200)). The lack of price suppression or depression detracts from the Commission's acceptance of Corteva's claims that it was "priced out" of the market.

If subject import prices generally increased during much of the period in which Corteva withdrew from the merchant market, the Commission was required to explain how those pricing trends demonstrated that subject imports forced Corteva from the market. *See Universal Camera*, 340 U.S. at 488 (substantial evidence review requires consideration of "whatever in the record fairly detracts from" the agency's conclusion); *Nippon Steel Corp.*, 458 F.3d at 1351 (substantial evidence is evaluated on the record as a whole).

Ultimately, the Commission accepted Corteva's *post hoc* rationalization while discounting substantial contemporaneous evidence pointing to a different explanation for Corteva's withdrawal. *See Views* at 70 (C.R. 200). At a minimum, the Commission should have adequately explained why the contemporaneous evidence—including purchaser reports regarding supply

constraints, Corteva's own operational decisions, its reduced merchant-market participation, its ample unused capacity, and the actual pricing record—did not materially undermine the causal inference on which its "priced out" finding rests. *See Taiwan Semiconductors*, 266 F.3d at 1345; *Hynix*, 431 F. Supp. 2d at 1317-20. Because neither the Commission nor Corteva provides that explanation, the Commission's finding that Corteva was "priced out" of the merchant market is unsupported by substantial evidence.

## IV. THE COURT SHOULD NOT AFFIRM THE COMMISSION'S IMPACT ANALYSIS BECAUSE THE COMMISSION FAILED TO REASONABLY EXPLAIN HOW THE DOMESTIC INDUSTRY WAS HARMED BY REASON OF SUBJECT IMPORTS

The Commission must "examine the relevant data and articulate a satisfactory explanation for its action . . . ." to avoid remand. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. The question here is whether the Commission reasonably demonstrated that the domestic industry's injury is "by reason of" subject imports. The Commission did not. The Commission attempts to defend its impact determination by emphasizing declining merchant-market sales, revenues, operating income, and profitability. Def. Br. at 68-71.

Although the Commission need not isolate injury attributable to *every* other factor, it must ensure that injury caused by other sources is not improperly attributed to subject imports. *Taiwan Semiconductors*, 266 F.3d at 1345. As in its volume and price analyses, the Commission failed to consider the record as a whole, giving undue weight to unsubstantiated Corteva data and testimony while ignoring contrary record evidence. Particularly relevant to the impact analysis, the Commission never adequately explained why the numerous intervening events documented in the record—including (1) Corteva's voluntary exit from the merchant market; (2) the fact that the Commission's valuation of Corteva's internal consumption in interim 2024 was contrary to the findings of its own Staff; (3) the peculiar dynamics of a one-acid producer market where that sole

domestic producer is vertically integrated, internally consumes the vast majority of its own production, and benefits from exclusive, patent-protected downstream market access; and (4) the role of nonsubject imports in the market during the POI—did not break the causal link between subject imports and the domestic industry's condition.

1. The Commission Acknowledged that Corteva's Withdrawal from the Merchant Market Would Break the Causal Link Between Subject Imports and Injury

The Commission fails to address the central point that Corteva's withdrawal from the market broke the causal link between subject imports and Corteva's declining performance. Moreover, the Commission cannot give weight to Corteva's claims of material injury when U.S. customers were forced to rely on subject imports. *OCP II*, 2025 WL 1837257, at * 12. The Commission simply assumes that if Corteva possessed available capacity, subject imports must have constituted the sole cause of its continuing merchant-market decline. Def. Br. at 68-69. That conclusion does not follow from the record.

Trade indicators for Corteva's performance in the merchant market demonstrate that there cannot be a causal nexus between subject imports and the declines in Corteva's shipments. Pls. Br. at 75. Corteva's commercial U.S. shipments fell from **[ ]** pounds in 2021 to **[ ]** pounds in 2022 to **[ ]** pounds in 2023 and were lower in interim 2024 at **[ ]** pounds in interim 2024 compared with **[ ]** pounds in interim 2023. *Final Staff Rpt.* at Table 3.8 (C.R. 179). Over the course of the POI, Corteva also **[ ]** from **[ ]** pounds in 2021 to **[ ]** pounds in 2022, **[ ]** pounds in 2023, and only **[ ]** pounds in interim 2024 compared with **[ ]** pounds in interim 2023. *Id*. Examining the same period, subject imports declined by **[ ]** percent from **[ ]** pounds in 2022 to **[ ]** pounds in 2023, and domestic market share remained steady as apparent U.S. consumption also declined. *Id.* at Tables 4.2 & 4.9 (C.R. 179).

Nevertheless, for 2023 and interim 2024, the Commission found that "the domestic industry's production and shipments decreased drastically as a result of significant and increasing volumes of low-priced cumulated subject imports, leading to losses in operating income and deteriorating financial indicators in 2023 and interim 2024." *Views* at 79 (C.R. 200).

The Commission relies on Corteva's capacity utilization in 2023 and interim 2024. Def. Br. at 73. Contrary to the Commission's argument, the fact that Corteva had ample capacity does not restore the broken causal chain. The relevant question is not whether Corteva eventually regained productive capacity, it is whether the Commission explained why customer relationships lost during the supply disruptions, Corteva's reduced merchant-market participation, and its strategic emphasis on internal production explained its performance. The Commission fails to address that question.

The Commission's argument that Plaintiffs produced no evidence that the supply chain constraints in 2021 and 2022 reflected Corteva's decision to exit the merchant market or that Corteva experienced supply constraints in 2023 and interim 2024 is misleading. Def. Br. at 71. Notably, the Commission acknowledged that, if substantiated, Corteva's withdrawal from the merchant market would "attenuate competition or otherwise break the causal nexus between the domestic industry's injury and cumulated subject imports," *Views* at 81 (C.R. 200); Pls. Br. at 75. While recognizing the critical importance of addressing Corteva's merchant-market withdrawal, the Commission failed to address the record evidence that Corteva (1) was focusing on its internal consumption in 2021 and 2022; (2) made **[ ]** U.S. shipments of 2,4-D acid in 2023, which declined to **[ ]** in interim 2024; (3) presented **[ ]** offer to supply during the POI before the underlying investigations began; and thus (4) failed to present evidence regarding how Corteva was harmed by the substantial sales it refused to make. Def. Br. at 71-72; Pls. Br. at

75. In fact, Corteva was able to point only to a **[ ]** price quote to **[ ]** that it made after the supply constraints were resolved. Def.-Int. Br. at 26.

The Commission points to the Commission finding that "Corteva had ample available capacity to supply both its internal consumption and the merchant market in 2023 and 2024." Def. Br. at 69. The Commission also argues that the Commission considered Respondents' argument that Corteva's declining market share and performance resulted from its voluntary exit from the market but found that these claims were "unsupported by record evidence." *Id.* These points ignore the voluminous record evidence documenting Corteva's choice not to sell to customers in 2023, as discussed above in Sections III.A. and III.B.2. By failing to consider the record as a whole, the Commission failed to properly account for Corteva's commercial behavior in its impact analysis. *See Universal Camera*, 340 U.S. at 488; *Nippon Steel*, 458 F.3d at 1351.

#### 2. The Commission's Valuation of Corteva's Internal Consumption in Interim 2024 Remains Unjustified and Contrary to the Findings of Its Own Staff

If this Court rejects the Commission's application of the "captive production" provision and requires the Commission to take into account Corteva's internally consumed 2,4-D, the question will be how to value that internal consumption of 2,4-D in interim 2024 since Corteva made no sales of 2,4-D in the U.S. merchant market in that critical period. The Commission finally settled on the use of a value derived from imports of 2,4-D from all sources as the basis to value Corteva's production during this period. *Views* at 77 n.317 (P.R. 164).

In the investigation, Plaintiffs noted that the Commission had rejected Corteva's proposed use of a per-pound value based on subject imports as subject imports were found to have been sold at less than fair value. But the Commission nevertheless found that the AUV of <u>all</u> imports to be an appropriate value, reasoning that "{t}the AUV of U.S. shipments for all

imports was appreciably higher, in that it included shipments of fairly traded imports." Def. Br. at 41.

It is difficult to believe that the Commission has taken this position. The following chart summarizes the U.S. shipment data on which the Commission's calculation was based:[12]

| | Quantity (1,000 lbs.) | Value ($1,000) | Average Unit Value (USD/lb.) |
|---|---|---|---|
| India | **[** | | **]** |
| China | **[** | | **]** |
| Total Subject | **[** | | **]** |
| Non-Subject | **[** | | **]** |
| Total Imports | **[** | | **]** |

It strains credulity for the Commission to assert that the (apparently acceptable) AUV of all imports was "appreciably higher" than the (apparently unacceptable) AUV of subject imports, when the former was in fact only **[ ]** higher (*i.e.*, **[ ]**). And the reason that these values are so close is clear: subject imports constitute **[ ]** of total U.S. shipments of U.S. imports.

Plaintiffs maintain that the AUV of **[ ]** is the only appropriate figure for valuing Corteva's internal consumption during this period. The Commission claims that Plaintiffs failed to explain why this value was the more reasonable value, Def. Br. at 41 n.28, but in so doing, the Commission ignores the record. First, this was the figure <u>Corteva itself</u> originally used to value its internally consumed production in interim 2024 before subsequently and inexplicably changing this amount. Pls. Br. at 41. In the context of Corteva's decision to stop making sales into the U.S. merchant market during interim 2024, the Commission credited Corteva with having extremely accurate information on market values for the domestic like product. *Views* at

[12] *Final Staff Rpt.* at Table C-1 (C.R. 179).

56-57 n.317 (P.R. 164). It is therefore unclear why the Commission would not have relied on Corteva's expert market intelligence in this context as well. Second, and perhaps more important, the Commission's own staff called the **[ ]** in its own analysis of the various values presented. Pls. Br. at 39 (citing Correspondence on Interim 2024 Internal Consumption Valuation, EDIS Doc. 848748 (C.R. 176)). Thus, it appears that the Plaintiffs, the Commission Staff and Corteva (at least initially) all support the use of a figure of **[ ]**, with the Commission being the outlier. Under these circumstances, it is unreasonable for the Commission to rely on its figure of **[ ]** to value Corteva's internal consumption in interim 2024.

3. The Commission Failed to Account for the Impact of Corteva's Vertically Integrated Downstream Business on the Upstream Domestic 2,4-D Market

The Commission also fails to adequately account for the flawed causation analysis in which the Commission ignored how Corteva's vertically integrated downstream business shaped competition in the upstream 2,4-D acid market. Def. Br. at 70. Unlike subject import suppliers, Corteva was not simply a merchant producer of commodity 2,4-D acid. Corteva was the sole domestic producer of 2,4-D acid that in turn consumed 2,4-D internally to produce downstream herbicides. Indeed, the **[ ]** of domestically produced 2,4-D acid was consumed internally in those downstream operations rather than sold in the merchant market. *See Final Staff Rpt*. at 2.9-2.10, Tables 6.1 & C.1 (C.R. 179).

In 2021 and 2022, as the Commission acknowledged, Corteva experienced significant production disruptions resulting from the Texas freeze and COVID-related supply shortages. *Views* at 78-79 (C.R. 200). During that period, Corteva prioritized internal herbicide production and reduced merchant-market sales. *Id.* at 79. For merchant purchasers, this meant that when

Corteva prioritized its internal consumption of 2,4-D acid, merchant purchasers could obtain domestic acid only from the residual volume that Corteva elected to sell externally.

In addition, Corteva remained the owner of valuable proprietary herbicide technologies and EPA registrations that permitted it to manufacture and market branded downstream herbicide products unavailable to many competitors. *See Final Staff Rpt*. at 2.9-2.10 (C.R. 179).

Corteva's proprietary Enlist® seed and herbicide has a pervasive impact on the downstream market: while the pre-emergence and post-emergence phases constitute 80 percent of total herbicide usage in a planting cycle, a farmer who plants Enlist® seed is required by its agreement with Corteva and by regulations issued by the EPA to use Enlist® herbicide. *See Views* at 39 (C.R. 200); Hearing Tr. at 122-23 (Hartman) (National Corn Growers Association testifying that farmers using Enlist PowerCore corn seed "cannot use any other 2,4-D herbicides" for pre- or post-emergence applications); 124-26 (Ragland) (American Soybean Association testifying that "Corteva has cornered the soybean market with its 8 Enlist seed trait genetics.") (P.R. 135). In other words, Corteva had a commercially protected downstream distribution channel for its internally produced 2,4-D acid that was unavailable to others selling commodity 2,4-D acid.

The Commission acknowledged neither the significance of the patent protection nor the role of EPA registration requirements in shaping conditions of competition in the domestic market. In relying on the purchasers' accounts that patent protection had not impeded subject imports, Def. Br. at 70 (citing *Views* at 84 (C.R. 200)), the Commission neglected the fact that EPA registrations are product-specific and costly to obtain, thereby creating substantial barriers to substitution and influencing purchasers' sourcing decisions independently of price – or that Corteva's proprietary technologies afforded commercial opportunities unavailable to producers selling only commodity acid. Hearing Tr. at 23 (Ericson) (P.R. 135).

The Commission argues that the Commission accounted for the lack of head-to-head competition by merely restating that subject imports captured **[ ]** percentage points of market share from the domestic industry during the POI. Def. Br. at 71. As discussed above in Section IV, the Commission once again fails to address Plaintiffs' contention that although subject imports increased in volume and gained **[ ]** percentage of points of market share from 2021 to 2022 despite mostly overselling in 2022, they decreased in volume and gained no additional market share from 2022 to 2023. Pls. Br. at 61. Moreover, although the Commission noted that "internal consumption accounted for most U.S. shipments reported by Corteva, importers, and converters," the Commission failed to address the undisputed record evidence that Corteva internally consumed between **[ ]** and **[ ]** percent of its total U.S. shipments during 2021-2023, which increased to **[ ]** in interim 2024. Pls. Br. at 72-73; *Final Staff Rpt*. at Tables 3.8 and D.12 (C.R. 179).

These structural characteristics distinguish this market from a conventional commodity market in which all suppliers compete interchangeably for the same sales. *Views* at 84 (C.R. 200). Without explaining how Corteva's **[ ]** internal consumption and correspondingly **[ ]** merchant-market participation affected competition between subject imports and domestic like product, the Commission could not reasonably attribute the market share shifts to subject imports or address Plaintiffs' causation argument. The Commission's impact analysis treated Corteva as though it competed solely as a merchant seller of commodity acid. In doing so, it ignored market characteristics that directly affected Corteva's production decisions, customer relationships, and commercial incentives.

4. Nonsubject Imports Played an Important Role in Market Dynamics During the POI

The Commission's response likewise fails to cure the Commission's erroneous treatment of nonsubject imports and continues to rely on the flawed premise that Corteva's U.S. shipments

were primarily in acid form while nonsubject imports were imported entirely in ester form. Def. Br. at 73-75 (citing *Views* at 85 (C.R. 200)). However, Table 4.5 of the Staff Report that the Commission relies upon for its finding shows the opposite: Only **[ ]** percent of Corteva's U.S. shipments were in acid form whereas **[ ]** its shipments were in the derivative salt or ester forms. *Final Staff Rpt*. at Table 4.5 (C.R. 179); Pls. Br. at 77.

The Commission also sidesteps Plaintiffs' argument that importers and purchasers rated nonsubject imports and the domestic like product as always or frequently interchangeable by arguing that U.S. Converters purchase 2,4-D acid on the merchant market for conversion into esters and salts and would have little use for higher-priced nonsubject imports of 2,4-D esters. Def. Br. at 74; Pls. Br. at 77. However, this improperly narrows the analysis to Converters purchasing 2,4-D acid for further processing.

In addition, the increase in nonsubject imports shows that other imports also expanded substantially during the very period in which the Commission attributed the domestic industry's declining performance exclusively to subject imports. Pls. Br. at 76. That market development required explanation regardless of whether the additional nonsubject imports consisted primarily of esters or acid. Furthermore, while acknowledging that responding U.S. purchasers and importers consistently reported the domestic like product and nonsubject imports as always or frequently interchangeable, the Commission offers no explanation as to why those findings should be disregarded simply because one category of purchasers, *i.e.*, Converters, typically purchased acid rather than esters. Def. Br. at 74. The Commission also fails to explain the significance of the dramatic increase in nonsubject imports during 2023. *Id*.

The Commission must reasonably explain why injury attributable to other market forces is not improperly attributed to subject imports. *Taiwan Semiconductors*, 266 F.3d at 1345. It also

must evaluate the record as a whole—including evidence detracting from its conclusions—and "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Universal Camera*, 340 U.S. at 488; *Nippon Steel*, 458 F.3d at 1351. Accordingly, because the Commission never reconciled the multiple intervening events reflected throughout the record before attributing the domestic industry's deteriorating condition to subject imports, its adverse impact determination is unsupported by substantial evidence and should be remanded.

## V. CONCLUSION

For the foregoing reasons, the Court should hold that the Commission's final affirmative material injury determination in the underlying investigations is unsupported by substantial evidence on the record and otherwise not in accordance with law. The Court should remand the investigation to the Commission and grant such other relief as may be just and proper.

Respectfully submitted,

/s/ Deanna Tanner Okun
Deanna Tanner Okun
Lydia C. Pardini
Alissa M. Chase
Joonho Hwang
Polsinelli PC
1401 I ("Eye") Street, NW Suite 800
Washington, DC 20005
Tel: 202-626-8329
Email: dtokun@polsinelli.com

*Counsel to Plaintiff Drexel Chemical Company*

/s/ Eric C. Emerson
Eric C. Emerson
Garrett Kays
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: 202-429-8076

Email: eemerson@steptoe.com

*Counsel to Plaintiff PBI-Gordon Corporation*

/s/ Daniel J. Porter
Daniel J. Porter
William C. Sjoberg
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: 202-663-8140
Email: daniel.porter@pillsburylaw.com

*Counsel to Plaintiff Nufarm Americas Inc.*

Dated: August 28, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to sections 2(B)(1) and (2) of the Standard Chambers Procedures of this Court, that this brief contains no more than 15,773 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Eric C. Emerson
Eric C. Emerson, Esq.
(Lead Attorney)